IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

NORTHERN DIVISION

| | |
|---|---|
| MARVIN G. NEFF and ALICE NEFF,<br><br>     Plaintiffs,<br><br><br>     v.<br><br>CHIEF NATE THOMPSON, individually;<br>OFFICER THERON FIELDING,<br>individually; WILLARD CITY, a municipal<br>corporation; TONY ALARID, individually<br>and as agent for WASATCH CONSTABLES,<br>L.C., a Utah limited liability company;<br>DEPUTY AUSTIN BOWCUTT, individually<br>and as agent for BOX ELDER COUNTY;<br>OFFICER MICHAEL COLVIN, individually<br>and as agent for PERRY CITY POLICE<br>DEPARTMENT OF PERRY CITY, a<br>Municipal Corporation,<br><br><br>     Defendants. | MEMORANDUM<br>DECISION AND ORDER<br><br><br>Case No. 1:11-cv-00157-RJS<br>Judge Robert J. Shelby |

On September 20, 2010, Deputy Ogden City Constable Tony Alarid attempted to effect service of court documents on Marvin Neff at his home in Willard City. What transpired that afternoon and evening is hotly disputed. But it is clear that Mr. Alarid's actions began a series of events that resulted in law enforcement officers responding to a call that shots had been fired on

the Neffs' property.  Officers eventually confronted Mr. Neff, who was tased before being taken into custody.

Marvin and his wife Alice Neff bring this action against Mr. Alarid, the constable service that tasked him with effecting service on Mr. Neff, a number of law enforcement officers, and several municipalities.  The Neffs allege Defendants violated their rights protected by the United States Constitution and Utah Constitution.   The Neffs also bring tort claims alleging that Defendants violated their personal rights.  Defendants now move the court to dismiss all of the Neffs' claims against them on the bases that Defendants' actions were reasonable under the circumstances, and that Defendants enjoy immunity from suit for the claims asserted.

After careful consideration, and for the reasons stated below, the court grants in part Defendants' motions for summary judgment and dismisses the Neffs' federal claims.  The court remands the remaining state claims to the First Judicial District Court for Box Elder County.

## RELEVANT BACKGROUND

### I.     Mr. Alarid's First Attempt to Serve Mr. Neff

Melvin Knowles, a private attorney, hired Wasatch Constables, L.C. to serve Marvin Neff with a civil summons in an unrelated case.  (Dkt. 115 at 3.)  Wasatch Constables assigned Tony Alarid to effect service.  (*Id.* at 4.)

Mr. Alarid and Wasatch Constables submit that Mr. Alarid is "a sworn peace officer in the State of Utah, having obtained his Special Functions Officer certification from the Peace Officer Standards and Training Academy," and he is also a Deputy Ogden City Constable, deputized and supervised by the Ogden City Constable.  (Dkt. 110 at 6.)  The Neffs contend that Mr. Alarid is not a sworn peace officer, but is instead, in essence, a civilian working for a private

company.  (Dkt. 115 at 3.)  The Neffs further argue that Mr. Alarid is not a Deputy Ogden City Constable, does not work for Ogden City, and works solely for Wasatch Constables.  (*Id.*)

During the day of September 20, 2010, Mr. Alarid drove to the Neffs' residence in Willard City, Utah to serve Mr. Neff with a civil summons.   In doing so, he drove past a "No Trespassing" sign posted on the Neffs' property, and then parked on the Neffs' property.  Unable to locate Mr. Neff, Mr. Alarid eventually drove away.  (*Id.* at 5.)

At the time, Mr. Neff was out checking on his cows.  Mr. Neff saw Mr. Alarid and his car stop at the Neffs' home.  (*Id.*)  From Mr. Neff's perspective, he saw a stranger dressed in dark clothing, looking into the windows of Mr. Neff's house.  Mr. Neff thought that this stranger might be "casing out" the house.  (*Id.*)  Mr. Neff, however, was too far away to confront Mr. Alarid, and Mr. Alarid drove away before Mr. Neff got back to his house.  (*Id.*)

## II.     Second Attempt at Service

Later that day, when it was still light, Mr. Alarid drove back to the Neffs' residence in another attempt to serve Mr. Neff.  (*Id.*)  Mr. and Mrs. Neff were picking peaches in their orchard.  (*Id.*)  Mr. Alarid saw Mr. Neff, and approached him to serve the summons.  From Mr. Neff's perspective, he saw a person dressed in dark clothes with no badge coming towards him. (*Id.*)  At some point, Mr. Neff came to understand that Mr. Alarid was there to serve him court papers.  Mr. Neff told Mr. Alarid that if Mr. Alarid wanted to serve him, Mr. Alarid needed to make an appointment and come to Mr. Neff's business office.  (*Id.* at 6.)

Mr. Alarid and Mr. Neff dispute how the interaction between them escalated.  Mr. Alarid alleges that Mr. Neff threw a peach at him.  Mr. Alarid also alleges that Mr. Neff chest bumped him.  (Alarid Deposition at 67:5-8, Dkt. 67-14.)

In contrast, Mr. Neff contends that Mr. Alarid did not initially identify himself, so he believed that Mr. Alarid might be a thief. Mr. Neff further contends that he asked Mr. Alarid to get off his property. (Marvin Neff Deposition at 121:4-7, Dkt. 67-7.) Mr. Neff testifies that he started walking towards Mr. Alarid's vehicle, and as he was doing so Mr. Alarid "came behind me, walking real fast, walking behind me and caught up to me. And when he caught up to me, he slammed into me with his body and about knocked me over." (*Id.* at 121:7-13.) Mr. Neff also testifies that even though Mr. Alarid slammed into him, Mr. Alarid then "kind of spun around in front of [Mr. Neff] . . . put his hand on his hip," then said to Mr. Neff "[t]hat's assault, buddy, and I'm armed." (*Id.* at 121:22-122:4.) Mr. Neff admits that he responded "[f]ine. I can be armed too. I've got a gun in the house." (*Id.* at 123:15-18.) Both parties agree that at some point in the interaction, Mr. Alarid threw down the papers and informed Mr. Neff that he had been served. (*Id.* at 122:8-13.)

Mr. Alarid then got into his car to leave. Mr. Alarid contends that he turned his vehicle around and started to drive slowly away from the house, but about midway down the lane, he looked up in his rearview mirror and saw Mr. Neff standing in what looked like a rifle stance pointing in his direction. (Alarid Deposition at 80:21-83:23.) Mr. Alarid testified that he heard a shotgun firing behind him as he left the Neffs' residence. (*Id.* at 84:8-16.) The Neffs' neighbor, Mike Crossley, stated that he heard what he thought was a gunshot around this time. (Crossley Statement, Dkt. 110 at 27.) Mr. and Mrs. Neff both testified that Mr. Neff did not get a gun, he did not take a rifle stance, and they did not hear a gunshot noise.

## III.    Mr. Alarid's Phone Call and Police Arrival

At around 8:00 p.m., just after Mr. Alarid left the Neff residence, Mr. Alarid stopped his vehicle and called 9-1-1. On the call, Mr. Alarid reported to Dustin Jensen – a dispatcher at the

Box Elder County Sheriff's Office – that he and Mr. Neff "got into a verbal argument." (Box Elder County Sheriff's Call Detail Report, Dkt. 67-3.) In addition, Mr. Alarid reported that as he "was leaving, Mr. Neff took a gun and shot off a round." (*Id.*) Shortly thereafter, Mr. Alarid called dispatch again and clarified "one shot was fired and possibly a second, [and he] believed [the shots] were [fired] in his direction." (*Id.*) In addition, Mr. Alarid reported that Mr. Neff "was holding a long gun, [but he was] unsure if [Mr. Neff was holding] a rifle or shot gun." (*Id.*) Mr. Neff contends that the sun had already set at the time Mr. Alarid left his residence, so it would have been impossible for Mr. Alarid to see Mr. Neff in his rearview mirror. (NOAA Sunrise/Sunset Calculator, Dkt. 81-6.)

After receiving the reports from Mr. Alarid, the Box Elder County dispatch notified various agencies that there was a "shots fired" call for the Neff residence. Since "shots fired" is an emergency call, Deputy Austin Bowcutt and Chief Nate Thompson both quickly responded, and arrived closely behind one another at the Neff residence.

Chief Thompson reported that, upon arrival, he spoke with Mr. Alarid regarding what occurred prior to the 9-1-1 call. Mr. Alarid recounted his version of the incident to Chief Thompson. Around this time, Chief Thompson called Officer Theron Fielding to assist him as a backup officer in the investigation. While waiting for Officer Fielding and other responding officers to arrive on the scene, Chief Thompson "sent officers from assisting agencies to watch the house." (Thompson Assist Narrative, Dkt. 81-7.)

Once the responding officers arrived, including Officer Fielding and Officer Michael Colvin, the officers made plans to position themselves and to make contact with Mr. Neff to learn Mr. Neff's side of the story. Deputy Bowcutt was assigned to get a visual on the front of the house to see if he could locate Mr. Neff. In addition, Officer Colvin was assigned to back up

Deputy Bowcutt. Deputy Bowcutt and Officer Colvin both entered the Neffs' property, without the Neff's permission, in order to carry out the assignment.

## IV.    Alice Neff and Brinton Neff

In the meantime, the Neffs' son Brinton received a text from his friend asking why officers were in front of the Neffs' residence. (Brinton Neff Deposition at 33:9-14, Dkt. 67-18.) Brinton and Mrs. Neff decided to get in one of the Neffs' vehicles – an SUV with tinted windows – to investigate what was happening outside. (*Id.* at 33:15-34:1.) They drove out of their property, travelled north on 200 West, eventually realized they could not get to the neighbors' house, and then attempted to return to their house. (*Id.*) Officer Fielding and Chief Thompson stopped the Neffs' SUV before Mrs. Neff and Brinton could return to the Neffs' residence.

Officer Fielding testified that there was an environment of heightened suspicion and awareness due to the "shots fired" call, and they stopped the Neffs' SUV because the SUV made a U-turn to go back to the Neffs' house. (Fielding Deposition at 41:19-43:15, Dkt. 67-8.) They stopped the SUV travelling south on 200 West. (*Id.*) Officer Fielding ordered the driver out of the SUV. (*Id.*) Mrs. Neff alleges that she had to walk backward. She had to put her hands on her head, kneel, and cross her legs. Officers handcuffed her and patted around her waistline for weapons. (*Id.* at 56:10-58:18.) After a few minutes, the officers removed the handcuffs. Mrs. Neff alleges that the officers "told us to go sit in our car, my car, and told us not to leave my car until they came and told us we could leave, Brinton and I went and sat in my car. We sat there and we sat there [for over 40 minutes]." (Alice Neff Deposition 58:7-63:9, Dkt. 81-3.) During their interaction with Mrs. Neff, officers asked her about what happened between Mr. Neff and

Mr. Alarid.  (*Id.*)  Mrs. Neff testified that she informed the officers that Mr. Alarid shouldered into Mr. Neff and no shots were fired.  (*Id.*)

## V.    Police Interaction with Mr. Neff

Shortly after 9:00 p.m., Chief Thompson called Mr. Neff to discuss the altercation between Mr. Neff and Mr. Alarid.  Chief Thompson did not inform Mr. Neff what the phone call was about, but asked Mr. Neff to come outside to talk.  (Marvin Neff Deposition at 137:11-142:13, Dkt. 67-7.)  Mr. Neff testified that he eventually agreed because of Chief Thompson's threats that he would send armed officers to retrieve Mr. Neff by force, which might result in injuries to his family members.  (*Id.*)

Mr. Neff testifies that when he came out of his house, Deputy Bowcutt and Officer Colvin pointed a flashlight in his eyes.  (*Id.* at 146:25-148:7.)  At this point, Mr. Neff believed the police interaction had something to do with the papers he received from Mr. Alarid.  (*Id.*)  Deputy Bowcutt knocked a phone out of Mr. Neff's hand and then pulled on Mr. Neff.  Mr. Neff pulled back, and then Deputy Bowcutt threw him on the ground and handcuffed him.  (*Id.*)  Officer Colvin then tased Mr. Neff.  (*Id.*)

Deputy Bowcutt testified that when Mr. Neff came out of his house, he instructed Mr. Neff to "show me your hands."  (Bowcutt Deposition at 35:1-2, Dkt. 59-1.)  Deputy Bowcutt also testified that "I told Mr. Neff that he wasn't under arrest, that I was just going to pat search him for weapons . . . I grabbed his wrists.  That's just to maintain control so if there was a weapon it couldn't be reached."  (*Id.* at 35:16-36:1.)  But Deputy Bowcutt testified that Mr. Neff resisted, so Deputy Bowcutt grabbed Mr. Neff's body and "brought Mr. Neff to the ground." (*Id.* at 38:8-19.)

Officer Colvin testified that Mr. Neff was "trying to break free from [Deputy Bowcutt.]" (Colvin Deposition at 67:23-68-1, Dkt. 61.) Officer Colvin also testified that "[t]here was a verbal command to tell [Mr. Neff] to stop fighting. And then they were going to the ground. There was dirt, dust coming up. It was quite a struggle. It wasn't just a passive . . . resistance." (*Id.* at 68:8-18.) Officer Colvin further testified "I'm worried about Bowcutt getting injured. I'm worried about me getting injured. I'm worried about [Mr. Neff] getting injured . . . I mean I'm 200 pounds. Bowcutt is another 230. I don't think that 500 pounds on top of [Mr. Neff] would be a good thing. So, I elected to deploy my Taser and fire it." (Dkt. 61 at 7 (citing Colvin Deposition at 68).)

## VI.     Subsequent Events and Detention

After Officer Colvin tased him, Mr. Neff was handcuffed. (Marvin Neff Deposition at 243:1-11, Dkt. 81-4.) Shortly thereafter, medical personnel arrived on the scene, but Mr. Neff refused medical transport. (*Id.*) Mr. Neff, still in handcuffs, was transported by a police officer to the Willard City Police Department's offices. (*Id.*) At the offices, Mr. Neff was given his Miranda rights, which he invoked. Mr. Neff was formally arrested and taken to the Box Elder County Jail.

## ANALYSIS

The Neffs bring this action against municipalities Willard City, Box Elder County, and Perry City Police Department; police officers Chief Thompson, Officer Fielding, Officer Bowcutt, and Officer Colvin; and process servers Mr. Alarid and Wasatch Constables.

Mr. and Mrs. Neff allege that Defendants are liable under 42 U.S.C. § 1983 for violations of their rights under the Fourth, Fifth, Ninth, and Fourteenth Amendments of the United States Constitution. In addition, Mr. and Mrs. Neff allege that Defendants are liable under 42 U.S.C. §

1985 for conspiring to interfere with the Neffs' civil rights, and 42 U.S.C. § 1986 for neglecting and refusing to prevent the conspiracy to interfere with their civil rights. The Neffs also allege that Defendants are liable for various State law tort claims and claims for violations of the Neffs' rights under the Utah Constitution.

Defendants seek a summary dismissal of all the Neffs' claims against them on the bases that Defendants' actions were reasonable under the circumstances, and that Defendants enjoy immunity from suit for the asserted claims. The court first sets forth the legal standard for evaluating these claims before turning to the merits of Defendants' motions for summary judgment.

## I.      Legal Standard

Rule 56(a) of the Federal Rules of Civil Procedure states that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "A material fact is one that might affect the outcome of the suit under the governing law, and a genuine issue is one for which the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008) (internal quotations and citations omitted). In making this determination, the court "view[s] the evidence and make[s] all reasonable inferences in the light most favorable to the nonmoving party." *N. Natural Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008).

## II.     Section 1983 Claims and Qualified Immunity

Under 42 U.S.C. § 1983, "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage of any state . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights,

privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." The Tenth Circuit has held that "Section 1983 provides a federal civil cause of action against state officials for the deprivation of any rights, privileges, or immunities secured by the Constitution." *Becker v. Kroll*, 494 F.3d 904, 913 (10th Cir. 2007). "The core inquiry under any § 1983 action . . . is whether the plaintiff has alleged a constitutional violation." *Id.*

But the Supreme Court explained that "[t]he doctrine of qualified immunity protects government official from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." *Pearson v. Callahan*, 555 U.S. 223, 229 (2009). In addition, "[t]he protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id.*

The Tenth Circuit instructs that generally "[u]nder the summary the summary judgment standard, [the court] review[s] the evidence in the light most favorable to the nonmoving party. However, [the court] review[s] summary judgment decisions involving a qualified immunity defense somewhat differently than other summary judgment rulings. This difference arises from the unique nature of qualified immunity, which is designed to protect public officials from spending inordinate time and money defending erroneous suits at trial." *Nelson v. McMullen*, 207 F.3d 1202, 1205 (10th Cir. 2000). So, "[w]hen a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right; and (2) the constitutional right was clearly established." *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013). "If the plaintiff fails to satisfy either part of the two-part inquiry, the court must grant the defendant qualified immunity." *Gross v. Pirtle*, 245 F.3d 1151,

1156 (10th Cir. 2001). "The court maintains discretion to determine which of the two prongs of the qualified immunity analysis should be address first in light of the circumstances in the particular case at hand." *Id.* (citing *Pearson*, 555 U.S. at 236). "In determining whether the plaintiff has met its burden of establishing a constitutional violation that was clearly established, we will construe the facts in the light most favorable to the plaintiff as the nonmoving party. However, because at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record." *Thomson v. Salt Lake County*, 584 F.3d 1304, 1312 (10th Cir. 2009). And "the record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden." *Gross*, 245 F.3d 1157.

A.      **Defendants That May Assert Qualified Immunity**

The court first analyzes which Defendants may assert qualified immunity. As stated above, the Neffs assert claims for relief against three groups of Defendants: [1] municipal entities; [2] the individual officers; and [3] the process servers. The parties agree that the municipal entity and the individual officers are permitted to assert a qualified immunity defense against the Neffs' claims. The Neffs, however, contend that the process servers are not permitted to assert such a defense.

The Tenth Circuit explained that there are two categories of private defendants. "In the first group, private defendants are permitted to assert qualified immunity when fulfilling duties under a government contract or following a court order. . . . [In the second group,] private defendants who invoked state law in pursuit of private ends [are] denied qualified immunity." *Warner v. Grand County*, 57 F.3d 962, 965-66 (10th Cir. 1995). For example, the Tenth Circuit has held that private companies that provide security inspectors for a national laboratory under a government contract are entitled to qualified immunity against allegations of hiring

discrimination.  *DeVargas v. Mason & Hanger-Silas Mason Co., Inc.*, 844 F.2d 714, 716 (10th Cir. 1988).  The First Circuit has held that a private physician under court order to perform a vaginal cavity search is also entitled to qualified immunity.  *Rodriques v. Furtado*, 950 F.2d 805, 814 (1st Cir. 1991).  In contrast, the Ninth Circuit has held that a private landlord who enlisted services of a police officer to effect an allegedly unconstitutional eviction was not entitled to qualified immunity.  *Hoerton v. Gabica*, 708 F.2d 380, 385 n.10 (9th Cir. 1983).  And the Sixth Circuit has held that a private defendant who obtained an allegedly unconstitutional state prejudgment attachment under a state's attachment statute is not entitled to qualified immunity. *Duncan v. Peck*, 844 F.2d 1261, 1266 (6th Cir. 1988).

Admittedly, the process server Defendants do not fit squarely into either category described by the Tenth Circuit.  But the court finds the private process server Defendants are more like those circumstances where the court denied qualified immunity.  Here, even though service of process advances a judicial proceeding, Mr. Alarid and Wasatch Constables were neither fulfilling duties under a government contract nor following a court order.  Rather, Mr. Alarid and Wasatch Constables were fulfilling a contract with a private attorney to serve a summons in a civil lawsuit.  The summons was signed by the private attorney, the service of process was contracted to a private entity, and that entity assigned it to a private individual to effect service.  In short, Mr. Alarid and Wasatch Constables were invoking state law pertaining to service of process in pursuit of a private attorney's civil objectives.  And while a civil litigant may choose to engage a government actor to assist with service of process in a civil suit, government involvement is in no way necessary to effect service.  This further suggests that qualified immunity does not extend to the specific circumstances here.

Accordingly, the court finds that the process server Defendants are not entitled to assert a qualified immunity defense. The qualified immunity of the remaining Defendants is considered in the context of the Neffs' specific claims, to which the court now turns.

### B. Fourth Amendment Claims

The Neffs allege that Defendants violated the Neffs' Fourth Amendment protections against [1] unreasonable search and seizure; [2] unreasonable use of force; [3] unreasonable arrest; [4] malicious prosecution; and [5] invasion of privacy. The court discusses each of these allegations in turn.

### 1. Unreasonable Search and Seizure Claims

The Neffs allege that Defendants violated the Fourth Amendment by unreasonably stopping and detaining Mrs. Neff, and unreasonably detaining Mr. Neff. The Tenth Circuit instructs that investigative detentions are evaluated in two steps. "First, we assess whether the detention was justified at its inception." *Lundstrom v. Romero*, 616 F.3d 1108, 1120 (10th Cir. 2010). "For an investigative detention to be valid, an officer must have had 'objectively reasonable articulable suspicion' that a detainee committed or is about to commit a crime." *Id.* (quoting *United State v. Cervine*, 347 F.3d 865, 868 (10th Cir. 2003)). "Second, we evaluate whether the officer's actions were 'reasonably related in scope to the circumstances that first justified the interference.'" *Id.* (quoting *Cervine*, 347 F.3d at 868). "A police officer may take such steps as are reasonably necessary to protect his safety and to maintain the status quo during a detention." *Id.* But "[i]f a police-citizen encounter exceeds the limits of an investigative detention, it then becomes an arrest that must be supported by probable cause." *Id.*

The court analyzes the Neffs' unreasonable search and seizure allegations in view of this two-step inquiry.

### a.        Step One:  Analysis of the Detention of Mrs. Neff and Mr. Neff

First, Mrs. Neff argues that Officer Fielding and Chief Thompson unreasonable detained her by stopping her SUV when she attempted to return home.  Second, Mr. Neff argues that Deputy Bowcutt and Officer Colvin unreasonably detained him in his driveway.  The Tenth Circuit has held that "the police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause . . . [E]ven ambiguous behavior, susceptible to an innocent interpretation, may give rise to a reasonable suspicion of criminal activity depending on the totality of circumstances."  *Oliver v. Woods*, 209 F.3d 1179, 1186 (10th Cir. 2000).

As to Mrs. Neff's allegation, officers responded to a "shots fired" call at the Neff residence.  In this environment of heightened suspicion and awareness, the officers observed an SUV with tinted windows drive out of the Neff residence, travel north, make a U-turn, and attempt to return to the Neff residence.  Officers reasonably believed that the SUV was related to Mr. Neff, a person they believed may have shot at Mr. Alarid.  In addition, the officers reasonably believed that the SUV acted suspiciously by driving out of the Neff residence, going up the street, turning around, and attempting to drive back to the Neff residence.  Under these circumstances, the court finds that Officer Fielding and Chief Thompson had a reasonable suspicion sufficient to stop the SUV, and they are entitled to qualified immunity for Mrs. Neff's unreasonable detention claim.

As to Mr. Neff's allegation, the police believed that Mr. Neff may have fired a shot at Mr. Alarid.  Until Deputy Bowcutt and Officer Colvin confirmed otherwise, they reasonably assumed that Mr. Neff had a firearm, and may have discharged it earlier that evening.  This

environment, combined with Mr. Neff's lack of cooperation, justified Deputy Bowcutt and Officer Colvin's initial detention and pat down of Mr. Neff.

Mr. Neff responds that he was detained in the driveway, within the curtilage of his home, and officers are not allowed to enter that curtilage absent exigent circumstances or probable cause – both of which were absent in these circumstances. *See Payton v. New York*, 445 U.S. 573, 586-87 (1980) (stating that absent exigent circumstances, the private property threshold may not reasonably be crossed without a warrant). The Tenth Circuit has explained that the "Fourth Amendment does not track property law. . . . [and] an individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding [or in the curtilage of] the home." *Rieck v. Jensen*, 651 F.3d 1188, 1192 (10th Cir. 2011). The court must consider four factors to determine whether a location can be considered a curtilage of one's home, and thus inaccessible to officers absent exigent circumstances or probable cause: "[1] the proximity of the area claimed to be curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by." *Rieck*, 651 F.3d at 1193. Specifically, the Tenth Circuit has held that "a driveway abutting and clearly visible from a public highway is not a suitable setting for intimate activities associated with a home [and thus not within the curtilage of the home.]" *Rieck*, 651 F.3d at 1193.

As to the first factor, the driveway where Mr. Neff was detained was in the vicinity, but clearly outside of his home. As to the second factor, the driveway was not enclosed. As to the third factor, the driveway was meant to be used to access the public road. As to the fourth factor, even though there were trees and fencing surrounding the Neffs' property, the Neffs' entire

driveway was visible from the public road. *See Rieck*, 651 F.3d at 1157 ("[A]lthough trees apparently blocked the view of the house and much of the property, they did not block the area in question from observation by those on the public road."); (*see also* Dkt. 68-2 (showing the Neff's entire lane visible from the road).) Analysis of the four factors compel the conclusion that Mr. Neff was detained in a place that was not a suitable setting for intimate activities associated with a home, and the analysis weighs heavily against Mr. Neff's argument that his driveway was within the curtilage of his home. For these reasons, the court finds that Deputy Bowcutt's and Officer Colvin's detention of Mr. Neff did not take place within the Neffs' home or the curtilage of the home.

In view of the court's findings that Deputy Bowcutt's and Officer's Colvin's detention of Mr. Neff was reasonable, and Mr. Neff was not detained within the curtilage of his home, the court also finds that Deputy Bowcutt and Officer Colvin are entitled to qualified immunity for Mr. Neff's unreasonable detention claim.

> **b.    Step Two:  Whether Officers Exceeded the Scope of Mrs. Neff's Detention**

The Neffs also contend that even if the initial stop of the Neffs' SUV was reasonable, the length and force used in the detention exceeded the permissible scope of the stop, in effect leading to a de facto arrest of Mrs. Neff. The Tenth Circuit has held that "the scope of an investigatory stop . . . must be reasonably related to the suspicious circumstances which justified the stop in the first place. . . . A law enforcement agent, faced with the possibility of danger, has a right to take reasonable steps to protect himself and an obligation to ensure the safety of innocent bystanders, regardless of whether probable cause to arrest exists." *United States v. Merkley*, 988 F.2d 1062, 1064 (10th Cir. 1993). "There are no hard-and-fast rules regarding the

reasonableness of force used during investigatory stops. . . . It is clear, however, that because safety may require the police to freeze temporarily a potentially dangerous situation, both the display of firearms and the use of handcuffs may be part of a reasonable Terry [investigative] stop." *Id.*; *see also United States v. Melendez-Garcia*, 28 F.3d 1046, 1050 (10th Cir. 1994) (holding a frisk for weapons, a request to step out of a car, the use of firearms, the use of handcuffs, and the use of other forceful techniques "does not necessarily transfer a Terry detention into a full custodial arrest.").

Here, as stated previously, the officers had reasonable suspicion to stop the Neffs' SUV. This reasonable suspicion was supported by the fact that officers believed Mr. Neff shot at Mr. Alarid, and that the situation involved a dangerous firearm. The court is mindful of Mrs. Neff's age and the treatment she received by the police. But under Tenth Circuit law, it was reasonable for the police, as a safety precaution, to order Mrs. Neff out of the SUV, to temporarily place her in handcuffs, and to pat her down – all of which lasted for only a few minutes. In addition, it was also reasonable for the officers to ask Mrs. Neff to stay in her car, and to prevent Mrs. Neff from returning to her house where officers had reason to believe a dangerous situation existed. The court finds that officers are entitled to qualified immunity for Mrs. Neff's claim that officers exceeded the scope of her detention.

### c. Step Two: Whether Mr. Neff's Arrest Was Supported by Probable Cause

Defendants also contend that Mr. Neff was not arrested when he was wrestled to the ground, nor was he arrested when officers placed Mr. Neff in a police car, nor was he arrested when officers transported him to the police station. Defendants contend that officers arrested Mr. Neff only after he arrived at the Willard City Police Department's Offices. The Tenth

Circuit has held that a "detention ceases to be [an investigative] stop and becomes an arrest if it continues for an excessive time or closely resembles a traditional arrest." *Morris v. Noe*, 672 F.3d 1185, 1192 (10th Cir. 2012). In this case, regardless of the fact that Defendants told Mr. Neff that he was not under arrest, the fact that officers tackled Mr. Neff, tased him, handcuffed him, and took him to the police station in a police car without his consent transformed the initial investigative stop into an arrest.

Having found that officers arrested Mr. Neff prior to bringing him to the police station, the court must determine whether the police had probable cause to arrest Mr. Neff, and whether the officers are potentially liable under Section 1983. The Tenth Circuit has held that "[w]hen a warrantless arrest is the subject of a § 1983 action, the defendant arresting officer is entitled to immunity if a reasonable officer could have believed that probable cause existed to arrest the plaintiff. . . . Probable cause exists if the facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense. . . . Even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity." *Oliver v. Woods*, 209 F.3d 1179, 1188 (10th Cir. 2000).

Here, officers responded to a "shots fired" call stemming from a report made by Mr. Alarid that Mr. Neff fired shots at him. After officers arrived on the scene, Chief Thompson called Mr. Neff to discuss his altercation with Mr. Alarid, hoping to discern whether Mr. Neff had indeed fired shots at Mr. Alarid. Mr. Neff only reluctantly agreed to come out and speak with the officers. When Mr. Neff exited his home, officers attempted to detain and check him for weapons. The officers, at this point, likely did not have probable cause to arrest or prolong the detention of Mr. Neff based solely on Mr. Alarid's report.

When viewing the record as a whole, the various descriptions of the events that occurred after Mr. Neff exited his home do not appear to the court to be directly contradictory. Rather it appears that each party is describing the same incident from his own perspective, emphasizing different aspects of the interaction. From Mr. Neff's perspective, when he exited his home, Officer Bowcutt knocked a phone of his hands, and then pulled on Mr. Neff. So, Mr. Neff pulled back, and Officer Bowcutt threw him to the ground, where they rolled from side to side. From Officer Bowcutt's perspective, he knocked the phone out of Mr. Neff's hand and attempted to detain Mr. Neff. Mr. Neff resisted, so Officer Bowcutt brought Mr. Neff to the ground, where they struggled. But even if there are minor disputes concerning the specific characterizations of what occurred after Mr. Neff exited his home, what is not disputed is that Mr. Neff pulled back, in other words, resisted when Officer Bowcutt tried to temporarily detain Mr. Neff and check him for weapons. In addition, the parties do not dispute that Mr. Neff and Officer Bowcutt rolled from side to side on the ground, in other words, struggled on the ground.

In light of the court's finding that it was proper for Officer Bowcutt to detain and search Mr. Neff, and in light of Mr. Neff's own admission that he resisted Officer Bowcutt's attempt to do so, the court finds that it was reasonable for Officer Bowcutt to bring him to the ground. In addition, in view of the rolling and the struggling that occurred on the ground, the court finds that officers could reasonably believe that they had probable cause to arrest Mr. Neff for assault of Deputy Bowcutt (or possibly other criminal violations) and are entitled to qualified immunity

for this action.  *See* U.C.A. § 76-5-102.4 ("A person is guilty of a class A misdemeanor . . . who assaults a peace officer.").[1]

**2.       Unreasonable Use of Force Claims**

Mrs. Neff alleges that Officer Fielding and Chief Thompson used unreasonable force in stopping her, handcuffing her, and patting around her waistline for weapons.  Because the court has already determined that the officer's treatment of Mrs. Neff was reasonable.  The court need not address this issue further.  Mr. Neff separately alleges that Deputy Bowcutt and Officer Colvin used excessive force in detaining him and tasing him.  The Supreme Court has explained that "[d]etermining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interest at stake. . . . The right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."   *Graham v. Connor*, 490 U.S. 386, 396 (1989).  "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396.  And "the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent and

---

[1] To the extent the parties dispute whether the police may arrest Mr. Neff before 10:00 p.m. under a detailed reading of the Utah Code, this is not the point.  (*Compare* Dkt. 81 (arguing "Utah's Code of Criminal Procedure states that any misdemeanor arrest, without a warrant, is unreasonable at nighttime in a private place.") *with* Dkt. 90 (arguing "any warrantless arrest of Marvin [Neff] occurred within daylight hours, which under U.C.A. § 77-6-5 ends at 10 p.m.").) The relevant inquiry for purposes of qualified immunity is whether officers reasonably, even if mistakenly, concluded that probable cause was present to arrest Mr. Neff.  As stated above, based on the struggle between Mr. Neff and Deputy Bowcutt, the court concludes that officers reasonably believed they had probable cause to arrest Mr. Neff for assault of a peace officer.

motivation." *Id.* at 397.   The Supreme Court set forth three factors to guide this reasonableness inquiry:  [1] "the severity of the crime at issue"; [2] "whether the suspect poses an immediate threat to the safety of the officers or others"; and [3] "whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*  The court considers each of these factors in the context of Mr. Neff's interaction with law enforcement.

As to the first factor, the officers were responding to a serious charge that Mr. Neff fired shots at Mr. Alarid.  The severity of this charge justified heightened caution in approaching and interacting with Mr. Neff.  As to the second factor, in this environment of increased suspicion and awareness, and in view of the late hour resulting in reduced visibility, it was reasonable for the police to suspect that Mr. Neff may have posed an immediate threat to their safety.  As to the third factor, Mr. Neff resisted when Deputy Bowcutt tried to secure Mr. Neff.  Deputy Bowcutt and Mr. Neff went to the ground where they struggled.  In light of these factors, the court finds that the force used by Deputy Bowcutt and Officer Colvin was reasonable, when viewed from the perspective of a reasonable officer on the scene at that time.

Admittedly, with 20/20 vision of hindsight, it appears that it may have been excessive to tase Mr. Neff.  But even if the court were to find that the use of a taser was excessive and Defendants violated Mr. Neff's constitutional right, the court would nevertheless dismiss this excessive force allegation against Officer Colvin under the doctrine of qualified immunity.  As stated above, "[w]hen a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that:  (1) the defendant violated a constitutional right; and (2) the constitutional right was clearly established." *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013).  The Tenth Circuit has held "[o]rdinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established

weight of authority from other courts must have found the law to be as the plaintiff maintains." *Morris v. Noe*, 672 F.3d 1185, 1196 (10th Cir.2012) (quotation omitted).

In view of this standard, Mr. Neff contends that this situation is like that in *Casey v. City of Federal Heights*, 509 F.3d 1278, 1281 (10th Cir. 2007). In that case, Mr. Casey unsuccessfully challenged a traffic ticket. The judge gave him his court file to appeal the decision. Because Mr. Casey was required to pay a fee for appeal and he had left his money in his truck, Mr. Casey went to the parking lot. He left the building with his court file, which was a misdemeanor under Colorado law. Officer Sweet learned from the clerk that Mr. Casey left the building with the file, and met Mr. Casey as he was on his way back to the courthouse. Officer Sweet asked Mr. Casey for the file, Mr. Casey held out his briefcase with the file clearly visible. Officer Sweet did not take the file, so Mr. Casey moved around the officer to take the file to the cashier. Officer Sweet grabbed Mr. Casey's arm and put it in an arm-lock. Mr. Casey moved his arm without breaking the officer's grip and started to walk to the courthouse with the file. Officer Sweet jumped on Mr. Casey's back, ripping Mr. Casey's shirt in the process. Officer Sweet never told Mr. Casey that he was under arrest, and never advised him to stop resisting. Another officer arrived, observed the scene, and tased Mr. Casey. The court found that officers used unreasonable force against Mr. Casey.

Here, the court finds that the circumstances are different than those presented in *Casey*. First, Mr. Casey's alleged wrongdoing of leaving the court with a file is more benign than Mr. Neff's alleged firing of a gun at Mr. Alarid. Second, Mr. Casey initially complied with the officer showing the officer the court file, while Mr. Neff failed to comply with the reasonable detention and pat down. Third, the officer never advised Mr. Casey to stop resisting, while

Deputy Bowcutt asked Mr. Neff to stop resisting. For these reasons, the court finds that the established weight of authority from the Tenth Circuit does not support Mr. Neff's assertion.

Rather, the court finds that this situation is more like the facts presented in *Hinton v. City of Elwood, Kansas*, 997 F.2d 774, 777 (10th Cir. 1993). In *Hinton*, Mr. Hinton discovered that his dog had been tranquilized and impounded by Elwood animal officer Mr. Hall. Mr. Hinton encountered Mr. Hall at Mr. Hall's residence. Mr. Hinton became angry and told Mr. Hall that the daughter of a prior landlord had become ill after she called the animal control officer about his dog. Mr. Hall interpreted this comment as a threat, and called the police. Mr. Hinton left the scene before the police arrived. Officer Myer responded to Mr. Hall's call and located Mr. Hinton. Officer Myer informed Mr. Hinton that he wanted to discuss the complaint made by Mr. Hall against Mr. Hinton. Mr. Hinton and Officer Myer began to engage in a heated exchange. At this point Chief White, police chief of Elwood, arrived and told Mr. Hinton to calm down. Mr. Hinton shoved Officer Myer, so Chief White grabbed Mr. Hinton from behind and told Mr. Hinton he was under arrest. Mr. Hinton began to struggle, and both Mr. Hinton and Chief White fell to the ground. Mr. Hinton continued to struggle on the ground, and Chief White used a stun gun on Mr. Hinton. Mr. Hinton was placed under arrest for disorderly conduct. The Tenth Circuit held that Officer Myer and Chief White were entitled to qualified immunity.

The court concludes that the situation here is similar to the facts presented in *Hinton*. Just as in *Hinton*, officers confronted Mr. Neff based on a serious threat reported by a third party. As in *Hinton*, the initial interaction started with a verbal confrontation that escalated to a struggle on the ground. As in *Hinton*, Officer Colvin used his stun gun in order to subdue Mr. Neff to stop the struggle. And finally, just as in *Hinton*, officers arrested Mr. Neff for alleged disorderly conduct.

Accordingly, even if the court were to conclude that Officer Colvin used excessive force against Mr. Neff violating his constitutional rights, the Neffs have failed to cite case law, and the court has found none, showing that Officer Colvin's use of a taser on Mr. Neff in this situation constituted a violation of a clearly established constitutional right. Rather, the Tenth Circuit case law supports qualified immunity for Officer Colvin's use of a taser on Mr. Neff in this situation.

Moreover, having found that officers did not use unreasonable force against the Neffs, the court must also dismiss the Neffs' claim that Defendants are liable because they have a duty to prevent fellow officers from using unreasonable force against the Neffs.

### 3.    Malicious Prosecution

The Neffs also allege malicious prosecution as a basis for their Section 1983 claim. The Supreme Court has observed that there is "an embarrassing diversity of judicial opinion" on the question of whether a malicious prosecution claim is actionable under Section 1983. *Albright v. Oliver*, 510 U.S. 266, n.4 (1994). The Tenth Circuit has held that "our circuit takes the common law elements of malicious prosecution as the starting point for the analysis of a § 1983 malicious prosecution claim, but always reaches the ultimate question, which it must, of whether the plaintiff has proven a constitutional violation . . . that constitutional right is the Fourth Amendment right to be free from unreasonable seizures." *Taylor v. Meacham*, 82 F.3d 1556, 1561 (10th Cir. 1996). These common law elements are "(1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) there was not probable cause to support the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages." *McCarty v. Gilchrist*, 646 F.3d 1281, 1285 (10th Cir. 2011).

Here, it is clear that Mr. Neff cannot satisfy these elements. First, the original action did not terminate in favor of Mr. Neff as he pled guilty to disorderly conduct. Second, and more importantly, Mr. Neff's guilty plea suggests that there was a basis for the arrest and subsequent prosecution. Third, the court has already concluded that officers reasonably believed they had probable cause to arrest Mr. Neff for assault of a peace officer and to confine him for that reason.

Because the Neffs fail to establish the common law elements of malicious prosecution, the court finds that Defendants are entitled to qualified immunity for the Neffs' malicious prosecution claim. *See Becker*, 709 F.3d at 1022.

### 4. Invasion of Privacy

The Neffs argue that in *United States v. Jones*, 132 S. Ct. 945, 954 (2012), the Supreme Court held that a trespass to obtain information results in an illegal search in violation of the Fourth Amendment. The Neffs contend that Mr. Alarid's trespass onto the Neffs' property combined with his efforts to seek information on the whereabouts of Mr. Neff resulted in a Fourth Amendment violation.

In *Jones*, the issue before the Supreme Court was whether the attachment of a Global Positioning System (GPS) tracking device to an individual's vehicle, and subsequent use of that device to monitor the vehicle's movement without a warrant constituted a search in violation of the Fourth Amendment. *Id.* at 948. The Supreme Court narrowly held that "the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a search." *Id.* at 949.

Here, unlike the circumstances in *Jones*, the main purpose of Mr. Alarid's encounter with Mr. Neff was not to discover information about him, but to serve him with legal papers. The court finds the Supreme Court's reasoning in *Jones* does not apply here.

In contrast, the court finds that Mr. Alarid's actions are more similar to the circumstances as presented in the Supreme Court's decision in *Oliver v. United States*, 466 U.S. 170, 171 (1984).  In *Oliver*, two police officers acted on reports of a marijuana grow on Mr. Oliver's farm. The officers entered onto Mr. Oliver's farm by walking around the gate, and discovered a field of marijuana.  Mr. Oliver asserts that he had a reasonable expectation of privacy in the field because [1] he posted "No Trespassing" signs at regular intervals; [2] he locked the gate at the entrance to the center of the farm; and [3] the field was highly secluded, bounded on all sides by woods, fences, and embankments.  *Id.*  The Supreme Court, in upholding the validity of the action by the officers, held the fact that "the government's intrusion upon [Mr. Oliver's] open field is a trespass at common law does not make it a search in the constitutional sense.  In the case of an open field, the general rights of property protected by the common law of trespass have little or no relevance to the applicability of the Fourth Amendment."  *Id.*

Just as in *Oliver*, Mr. Neff argues [1] he posted a "No Trespassing" sign on his property; [2] his property was somewhat enclosed, albeit less so than in *Oliver*; and [3] his property was secluded, surrounded by fencing and trees.  But, in accordance with the clear guidance from the Supreme Court, the court finds that Defendants' intrusion upon an open field, such as Mr. Neff's land, does not violate Mr. Neff's Fourth Amendment rights.  As such, even though Mr. Alarid does not have qualified immunity, the court finds that Mr. Alarid is not liable under Section 1983.

C.    **Fifth Amendment**

The Neffs next generally allege that the Defendants violated their rights under the Fifth Amendment by depriving them of their liberty and due process.  The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law."

U.S. Const. amend V.  The Supreme Court has held that the Fifth Amendment due process clause "appl[ies] to and restrict[s] only the Federal Government." *Public Utilities Commission of District of Columbia v. Pollak*, 343 U.S. 451, 462 (1952); *see also Schweiker v. Wilson*, 450 U.S. 221, 226 n.6 (1981) ("This Court has repeatedly has held that the Fifth Amendment imposes on the Federal Government the same standard required of state legislation by the Equal Protection Clause of the Fourteenth Amendment.").

Defendants are not employees or entities of the Federal Government.  So, the Fifth Amendment does not apply to or restrict the Defendants' actions.   Accordingly, the Neffs' Section 1983 claims asserting violations of the Fifth Amendment are dismissed.

### D.	Ninth Amendment

The Neffs also allege that the Defendants violated their Ninth Amendment rights.  The Ninth Amendment states that "the enumeration in the Constitution of certain rights, shall not be construed to deny or disparage others retained by the people."  U.S. Const. amend. IX.  The Supreme Court has held that, generally, "the ninth amendment has never been recognized as independently securing any constitutional right, for purposes of pursuing a civil rights claim . . . [and] the Supreme Court has repeatedly voiced concern that a section 1983 claim be based on a specific constitutional guarantee."  *Strandberg v. City of Helena*, 791 F.2d 744, 748 (9th Cir. 1986); *see also Bussey v. Phillips*, 419 F. Supp. 2d 569, 586 (S.D.N.Y. 2006) ("[T]he Ninth Amendment refers only to unenumerated rights, while claims under § 1983 must be premised on specific constitutional guarantees.").

Here, the Neffs have failed to adequately explain what specific rights guaranteed by the Ninth Amendment are relevant to this case.  Nor have the Neffs explained how those specific Ninth Amendment rights were violated by Defendants.  In view of the inadequate explanation by

the Neffs' regarding their Ninth Amendment claim, the court follows the general guidance from the Supreme Court and dismisses the Neffs' Section 1983 claims based on violations of the Ninth Amendment.

### E.    Fourteenth Amendment

The Neffs' next allege that Defendants used excessive force, stopped them unreasonably, seized them unreasonably, and searched them unreasonably in violation of not only the Fourth Amendment, but also in violation of the Fourteenth Amendment.  The Supreme Court has stated that for claims of excessive force, unreasonable stop, unreasonable seizure, and unreasonable search claims, "the Fourth Amendment provides an explicit textual source of constitutional protection . . . that Amendment, not the more generalized [Fourteenth Amendment] must guide the analyzing of [these] claims."  *Graham v. Connor*, 490 U.S. 386, 395 (1989).

Having dismissed the Neffs' excessive force, unreasonable stop, unreasonable seizure, and unreasonable search claims under the rubric of the Fourth Amendment, the court, in following the clear guidance from the Supreme Court, must also dismiss the Neffs' Fourteenth Amendment excessive force, unreasonable stop, unreasonable seizure, and unreasonable search claims for the same reasons.  *See id.* at 395-96 (stating that investigatory stop, search, seizure, and excessive force claims are more appropriately analyzed under the Fourth Amendment).

### F.    Municipal and Supervisory Liability

Mr. and Mrs. Neff also argue that they are entitled to relief under Section 1983 under municipal liability and supervisor liability theories.

### 1.    Municipal Liability

The Neffs contend that municipal entities Box Elder County, Willard City, and the Perry City Police Department had an informal custom of handcuffing first and checking for weapons

later.  The Neffs further allege that his informal custom leads to unlawful arrests subjecting the municipal entities to Section 1983 liability.  (Dkt. 81 at 81.)  For example, Officer Colvin testified that "[t]he old way of doing things, officers used to just grab the individual and start searching them.  Well, officers were getting shot and stabbed by these bad guys pulling out weapons from their waist band or pockets.  So we usually – now we handcuff first and then check for weapons later."  (Colvin Deposition 66:16-21, Dkt. 81-12.).  In addition, Deputy Bowcutt agreed that his directive was "to make contact and hold [Mr. Neff] . . . Just to speak with him and make sure it's safe to ask him questions."  (Bowcutt Deposition 22:11-22, Dkt. 81-13.)

But here, even if the court were to conclude that the municipal entities had the custom of handcuffing first and checking for weapons later, the Tenth Circuit has specifically held that officers may "take reasonable steps to protect themselves . . . [by using] handcuffs or plac[ing] suspects on the ground during a Terry stop."  *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993).  So, the Neffs' allegations against the municipal entities stem from a custom that the Tenth Circuit has specifically held to be reasonable.  Accordingly, the court dismisses the Section 1983 claims against Defendants Box Elder County, Willard City, and the Perry City Police Department.

### 2.	Supervisor Liability

The Neffs also argue that Chief Thompson is liable for the constitutional violations of Deputy Bowcutt, Officer Fielding, and Officer Colvin because he was their supervisor.  The Neffs contend that Chief Thompson gave orders to Deputy Bowcutt, Officer Fielding, and Officer Colvin that he reasonably should have known would result in constitutional violations. The Tenth Circuit explained that to impose supervisory liability under Section 1983, "the

plaintiff first [has] to establish the supervisor's subordinates violated the Constitution. Then the plaintiff must demonstrate an affirmative link between the supervisor and the violation." *Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010).

But here, as stated above, the court finds that the Neffs failed to establish that Chief Thompson's subordinates, Deputy Bowcutt, Officer Fielding, and Officer Colvin, are liable under Section 1983. Having determined that there is no underlying individual liability, the court need not decide whether there was an affirmative link between Chief Thompson and the individual officers. Accordingly, the court dismisses Section 1983 claims based on supervisory liability against Chief Thompson.

## III. Section 1985 Claims

The Neffs' also allege that Defendants are liable under Section 1985 for conspiracy to interfere with their civil rights. Under 42 U.S.C. § 1985(3), "[i]f two or more persons . . . conspire . . . for the purpose of depriving . . . any person or class of persons of the equal protection of the law, or of equal privileges and immunities under the laws . . . the party so injured or deprived may have an action for the recovery of damages[.]" The Tenth Circuit explained that §1985(3) "was intended, perhaps more than anything else, to provide redress for victims of conspiracies impelled by a commingling of racial and political motives." *Brown v. Reardon*, 770 F.2d 896, 907 (10 th Cir. 1985). The Supreme Court explained "in order to prove a private conspiracy in violation of the first clause of § 1985(3), a plaintiff must show, *inter alia*, (1) that some racial, or perhaps otherwise class-based, invidiously discriminatory animus lay behind the conspirators' actions, and (2) that the conspiracy aimed at interfering with rights that are protected against private, as well as official encroachment." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 267 (1993). "Whatever may be the precise meaning of a 'class' . . .

the term unquestionably connotes something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors.  Otherwise, innumerable tort plaintiffs would be able to assert causes of action under § 1985(3) by simply defining the aggrieved class as those seeking to engage in the activity the defendant has interfered with." *Id.* at 269.

Here, the Neffs neither pleaded nor provided evidence of racial or other class-based invidiously discriminatory animus behind the alleged conspirator's actions.  To the extent that the Neffs assert a "class that hates the police," the court finds that this is not the type of racial or other class-based invidiously discriminatory animus envisioned by Section 1985.  Accordingly, the court dismisses the Neffs' Section 1985 claims.

## IV.    Section 1986 Claims

The Neffs further contend that Defendants are liable under Section 1986 for neglecting and refusing to prevent the conspiracy to interfere with the Neffs' civil rights under Section 1985.  The Tenth Circuit has found that "failing a cause of action under [§ 1985], there is no cause of action under § 1986." *Phillips v. Kerns*, 483 F. App'x 400, 403 (10th Cir. 2012). Having dismissed the Neffs' Section 1985 claims, the court must also dismiss the Neffs' Section 1986 claims.

## V.    State Law Claims

In view of the court's dismissal of all federal claims against the Defendants, the court must determine whether it retains jurisdiction over the Neffs' state law claims.  The "district court has discretion to try state claims in the absence of any triable federal claims; however, that discretion should be exercised in those cases in which, given the nature and the extent of pretrial proceedings, judicial economy, convenience, and fairness would be served by retaining

31

jurisdiction." *Thatcher Enterprises v. Cache County Corp.*, 902 F.2d 1472, 1478 (10th Cir. 1990). The Tenth Circuit has clarified that "if federal claims are dismissed before trial, leaving issues of state law, the federal court should . . . generally decline to exercise pendant jurisdiction in such instances because 'notions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary.'" *Brooks v. Gaenzle*, 614 F.3d 1213, 1229 (10th Cir. 2010) (citing *Ball v. Renner*, 54 F.3d 664, 669 (10th Cir. 1995)).

Here, there is no compelling reason for the court to exercise jurisdiction over these state law claims. First, this court has not yet set a trial date and discovery is ongoing, so the nature and extent of the judicial proceedings do not weigh heavily in favor of exercising jurisdiction. Second, by this Order, the issues in this case have narrowed considerably, so judicial economy does not weigh heavily against remanding the case to state court. Third, it would be more convenient for all parties to litigate this action in the First District Court for Box Elder County, a court located closer to the parties. Fourth, the remaining claims involve important issues of state law that would best be decided by a state court. In view of important comity and federalism considerations, the court declines to exercise jurisdiction over the Neffs' remaining state law claims.

Having declined to exercise jurisdiction over the Neffs' remaining state law claims, the court must determine whether to dismiss the case or remand the case to state court. The Supreme Court had held that where "all federal-law claims in the action have been eliminated and only pendent state-law claims remain, the district court has a powerful reason to choose not to continue to exercise jurisdiction. A wide discretion to remand rather than to dismiss will enable district courts to deal with appropriate cases involving pendent claims . . . [and] a remand generally will be preferable to dismissal when the statute of limitations on the plaintiff's state-

law claims has expired before the federal court has determined that it should relinquish jurisdiction. . . . Even when the applicable statute of limitations has not expired, a remand may [be preferred] in light of the increased expense and time involved in enforcing state law that dismissal would entail." *Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 343 (1988).

The court is mindful that Plaintiffs have been prosecuting this case since its removal from the First District Court for Box Elder County on November 4, 2011, and that statutes of limitations might have expired during the pendency of the case in this court. In addition, the court is also mindful of the time and expense already expended litigating the case since its inception. Accordingly, the court remands the case to the First District Court for Box Elder County.

## CONCLUSION

For the reasons stated, the court GRANTS IN PART and DENIES IN PART Defendants' motions for summary judgment. (Dkt. Nos. 58, 60, 66, and 110). The court REMANDS the case to the First District Court for Box Elder County. In view of this decision, the court TERMS AS MOOT the Neffs' motion in limine (Dkt. 82); the Neffs' motion for discovery (Dkt. 84); Mr. Alarid's motion to quash subpoena to AT&T (Dkt. 106); and Mr. Alarid's motion to quash subpoena to Verizon (Dkt. 117); and the Neffs' motion for leave to file supplemental summary judgment worksheet (Dkt. 126).

SO ORDERED this 29th day of September, 2014.

BY THE COURT:

ROBERT J. SHELBY
United States District Judge